## UNITED STATES v. MASON et al.

### Civ. No. I-118.

United States District Court
S. D. Iowa, Central Division.

Dec. 20, 1951.

Wm. R. Hart, U. S. Atty., Cloid I. Level, Asst. U. S. Atty., Des Moines, Iowa, Wm. R. Sheridan, Asst. U. S. Atty., Keokuk, Iowa, for Government.

T. C. Jones, Des Moines, Iowa, for defendant Margaret Mason Crawford.

Henry T. McKnight, Des Moines, Iowa, for remaining defendants.

RILEY, District Judge.

Ernest Mason, hereinafter called the insured, while in the military service applied for and was granted a contract of National Service Life Insurance, effective June 1, 1942, in the amount of $10,000, in which he designated Mary Mason, his mother, as the sole beneficiary.

The beneficiary died Oct. 19, 1942. The insured died Feb. 8, 1945, leaving no issue, with the insurance in full force and effect and without having changed the beneficiary of record.

The Government commenced this action in the nature of an interpleader, joining as defendants all those believed to be within the permitted class of beneficiaries in such a case. The defendants are James Mason, Sr., father of the insured, John Mason (of unsound mind), James Mason, Jr., Merle Mason, Dorothy Mason Turner, Lena Mason Byrd, living brothers and sisters (there are no children of deceased brothers and sisters), Margaret Crawford, nee, Margaret Evans, to whom the insured was ceremonially married in Polk County, Iowa, on Oct. 22, 1928, and Julia Pierce Mason, with whom insured was alleged to have cohabited and who died Feb. 5, 1951, after the commencement of this action.

The defendant James Mason, Sr., father of the insured, left Des Moines on or about Oct. 26, 1924, and since that time nothing has been known as to his whereabouts, nor has there been any communication with or from him. An indictment for murder returned against him after his departure was dismissed by the District Court of Polk County, Iowa, on Dec. 29, 1925. Timely service is shown to have been had upon him by publication pursuant to court order. Defendant John Mason is confined as a person of unsound mind in the mental hospital at Clarinda, Iowa, and was represented by guardian ad litem designated by the court who filed answer in his behalf.

Julia Pierce (Mason) named as defendant in the complaint filed Dec. 7, 1950, made no appearance. John M. Estes as her administrator by appointment of the District Court of Polk County, Iowa, filed an answer alleging her death on Feb. 5, 1951, and his due appointment, asking that she be declared to be the legal wife and widow of the insured and that the proceeds of insurance be paid to her estate. There is no proof of a marriage. The evidence refers to her cohabitation with insured prior to his enlistment. The administrator did not appear in person or by counsel at the trial and was adjudged to be in default and the answer and claim was stricken.

The defendant Margaret Mason Crawford appeared claiming to be the widow of the insured by virtue of the marriage ceremony performed in Des Moines on Oct. 22, 1928, when she was 14 years of age and the insured more than two years older, and to be exclusively entitled to the proceeds of the insurance here involved. This defendant as Margaret Evans was committed October 27, 1928, by order of court to the Iowa State Industrial School for girls at Mitchellville, Iowa, as being "incorrigible and diseased", and to be confined there until the age of 21 years. This commitment was based upon a petition filed on Oct. 16, 1928, in the Juvenile Division of the Polk County District Court. After 3 years and 9 months in the institution Margaret Evans was paroled to an aunt in Des Moines with whom she went to live.

On Feb. 10, 1942, at Princeton, Mo., this same defendant was married as Margaret Evans to Louis Crawford and cohabited with him until sometime in the year 1946. During a period that Louis Crawford served in the Army she made application

for and received an allotment from his army pay as his wife. Louis Crawford died in 1950. The defendant testified that she first "decided" in May or June 1950 that she was the widow of the insured. Her words at the trial were—"I first decided that when I guess you say the Government man came to me and was asking questions". However, she admits that she testified under oath at a trial in January 1951 involving the murder of her husband that she was his widow.

All of the foregoing are facts admitted either in the pleadings or in the pre-trial conference and order or established without dispute by the evidence.

The court is confronted with a situation therefore wherein the Government admits its liability on the policy of insurance and its obligation to pay the prescribed instalments to those found to be entitled thereto. The controversy is between the defendant Margaret Evans Crawford, who claims the right to take as widow under (A) and the brothers and sisters who claim under (D) below. The question to be determined by the court is as to who falls within the permitted class of beneficiaries entitled to the proceeds. The classes are determined by the National Service Life Insurance Act of 1940, as amended, Section 802, Title 38 U.S.C.A., which provides for the payment in the event of death of the beneficiary in the following order:

Section 802(h) (3):

"(A) to the widow or widower of the insured, if living;

"(B) if no widow or widower, to the child or children of the insured, if living, in equal shares;

"(C) if no widow, widower, or child, to the parent or parents of the insured, if living, in equal shares;

"(D) if no widow, widower, child, or parent, to the brothers and sisters of the insured, if living, in equal shares."

The National Service Life Insurance Act of 1940 contains no definition of who is widow, child, parent, or brothers or sisters.

The Federal Employers' Liability Act of 1908, 35 Stat. 65, c. 149, 45 U.S.C.A. § 51 et seq., likewise contained no definition of the phrase "next of kin". The North Carolina Supreme Court undertook to define the term and held that next of kin for the purpose of recovery under the Act were the next of kin as established by the law of the State where the right of recovery obtained. A writ of error was prosecuted to review its action. The opinion by Mr. Chief Justice White in Seaboard Air Line R. v. Kenney, 240 U.S. 489, at page 493, 36 S.Ct. 458, at page 459, 60 L.Ed. 762, considers the question fully and says:

"1. There can be now no question that the act of Congress in so far as it deals with the subjects to which it relates is paramount and exclusive. It is therefore not disputable that recovery under the act can be had alone in the mode and by and for the persons or class of persons in whose favor the law creates and bestows a right of action. Second Employers' Liability Cases (Mondou v. New York, N. H. & H. R. Co.) 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327; Mich. Cent. R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417; Taylor v. Taylor, 232 U.S. 363, 34 S.Ct. 350, 58 L.Ed. 638; Seaboard Air Line R. Co. v. Horton, 233 U.S. 492, 501, 34 S.Ct. 635, 58 L.Ed. 1062, 1068. But this is irrelevant, since the controversy concerns only the meaning of the act, which it is conceded, when rightly interpreted, is entitled to exclusive operation.

"Plainly the statute contains no definition of who are to constitute the next of kin to whom a right of recovery is granted. But, as speaking generally under our dual system of government, who are next of kin is determined by the legislation of the various states to whose authority that subject is normally committed, it would seem to be clear that the absence of a definition in the act of Congress plainly indicates the purpose of Congress to leave the determination of that question to the state law. But, it is urged, as next of kin was a term well known at common law, it is to be presumed that the words were used as having their common-law significance, and therefore as excluding all persons not included in the term under the common law; meaning, of course, the law of England as it existed at the time of the separation from the mother

country. Leaving aside the misapplication of the rule of construction relied upon, it is obvious that the contention amounts to saying that Congress, by the mere statement of a class, that is, next of kin, without defining whom the class embraces, must be assumed to have overthrown the local law of the states, and substituted another law for it; when conceding that there was power in Congress to do so, it is clear that no such extreme result could possibly be attributed to the act of Congress without express and unambiguous provisions rendering such conclusion necessary. The truth of this view will be made at once additionally apparent by considering the far-reaching consequence of the proposition, since, if it be well founded, it would apply equally to the other requirements of the statute,—to the provisions as to the surviving widow, the husband and children, and to parents, thus, for the purposes of the enforcement of the act, overthrowing the legislation of the states on subjects of the most intimate domestic character, and substituting for it the common law as stereotyped at the time of the separation. The argument that such result must have been intended, since it is to be assumed that Congress contemplated uniformity, that is, that the next of kin entitled to take under the statute should be uniformly applied in all the states, after all comes to saying that it must be assumed that Congress intended to create a uniformity on one subject by producing discord and want of uniformity as to many others.

"But we need go no further, since the want of merit in the contention is fully demonstrated by authority."

Poff v. Pennsylvania R. Co., 327 U.S. 399, at page 401, 66 S.Ct. 603, at page 605, 90 L.Ed. 749, cites Seaboard Air Line R. v. Kenney, supra, and says: "It is clear that 'next of kin' is determined by state law." Our Court of Appeals mentioned the Kenney case in Woodward v. United States, 8 Cir., 167 F.2d 774, 778, saying that—"In the instant case, the choice is not between applying an ancient common-law definition of the term 'brother' and a state-law definition"—and treated the question as one of Federal law; but the question there involved was one of kinship and the court assumed "that Congress, in using the term 'brother' in relation to policies of National Service Life Insurance to be issued by the Government to those in its armed services throughout this country and abroad, intended the term to be taken and understood in its plain, ordinary, and popular sense."

Here the question involves only a legal status of the claimant Margaret Crawford. This legal status is based on a contract and rights created and conditioned by it. The Court of Appeals of this Circuit declared as much in Rittgers v. United States, 154 F. 2d 768, 772, in these words: "Plaintiff's right to recover is dependent upon her legal status, not upon her morals, her worthiness, nor her social standing." The 2nd Circuit discussed the question in Lembcke v. United States, 181 F.2d 703. After discussing the Woodward case, it says, at page 706: "But the word 'widow' has no popular meaning which can be determined without reference to the validity of the wife's marriage to her deceased husband, and the validity of such marriage necessarily depends upon the law of the place where the marriage was contracted. Such was the decision in Brown v. United States, 3 Cir., 164 F.2d 490. We agree also with this case, and see no inconsistency between it and the Woodward case, supra. In using the word 'widow,' without definition, we think Congress must have intended its meaning to be determined by the applicable local law, as it did in using the term 'next of kin' in the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Seaboard Air Line Ry. v. Kenney, 240 U.S. 489, 36 S.Ct. 458, 60 L.Ed. 762."

The Third Circuit holds to the same effect. Brown v. United States, 164 F.2d 490. This was an appeal by the plaintiff from an adverse judgment in a proceeding for declaratory judgment. She claimed the deceased soldier was her husband. The District Court, 72 F.Supp. 153, held that, although she was named as beneficiary, she was not the wife of insured and hence not entitled to the proceeds because of the limitations of the Act. The Circuit Court of Appeals, 164 F.2d 490, in a per curiam opinion said: "The question was one which was to be determined by the law of New Jersey, the state in which the alleged mar-

riage of the parties took place." Certiorari was denied, 333 U.S. 873, 68 S.Ct. 902, 92 L.Ed. 1149.

■ The court here will test the validity of the claim of Margaret Evans Crawford to be the widow of the insured by the law as declared in Iowa where her marriage to the insured took place. The only evidence she has offered against the dissolution of the first marriage is her own testimony that she never knew of any divorce or annulment. To be weighed against that is her testimony that she was told by the juvenile officer that their marriage was or would be annulled; that she believed it was annulled; that she believed to live with the insured after her release in 1932 she must be remarried to him. She testified that she believed she was free to marry Louis Crawford in 1942; that she lived with him as his wife thereafter, collected her allotment as his wife and testified under oath in January 1951 to be his wife. She testified that five days after her marriage in 1928 she was committed to the institution as Margaret Evans, discharged as such and lived as Margaret Evans with her aunt until her marriage to Crawford in 1942. She testified that she knew insured was living with Julia Pierce and that they lived in the same neighborhood.

Against that one item of negative proof that she knew of no divorce proceeding is the positive affirmative conduct for 23 years, all wholly inconsistent with and contradictory of the claim asserted here that she is the widow of the insured. Her entire actions, admissions and conduct negative such a claim.

■ It is the law of Iowa that the marriage of Margaret Evans to Crawford in 1942 is presumed to have been and to be lawful. In Iowa the presumption is so strongly in favor of the validity of a marriage and the innocence of the parties to it that a divorce of the married spouse is supposed to have been obtained. The Iowa court has cited in support of such a presumption authority that holds: "that the ordinary presumption in favor of the continuance of human life should not, under the facts of the case, outweigh the presumption in favor of the innocence of their cohabita-

tion, and that there was no legal impediment to their contracting the marriage relation." Blanchard v. Lambert, 43 Iowa 228. This case involved a claim of dower right.

The Iowa rule is thus stated in Re Estate of Edwards, 58 Iowa 431, 437, 10 N.W. 793, 795: "That there was a divorce must be conceded, or the other result follows, that appellant was guilty of bigamy when she married Baker, and that the deceased so knew. In the absence of clear and satisfactory evidence to the contrary, the presumption should be indulged that a divorce had been obtained, and the appellant lawfully contracted the marriage with Baker. The presumption of innocence, rather than guilt, should be indulged. The evidence is quite persuasive, if not entirely satisfactory, there was a divorce. When to this there is added the presumption of innocence, and the acts and declarations of the appellant, we think the preponderance of the evidence is that the appellant and the deceased were duly and legally divorced."

In the case of Farr v. Farr, 190 Iowa 1005, 181 N.W. 268, 270, the court discussed a proposition that is applicable to the marriage of Margaret Evans and Louis Crawford in Missouri in 1942, to the effect that the ceremonial marriage generates a strong presumption that the parties were competent to enter into such relation. The court recognized the principle that "To overcome the presumption of the validity of a marriage the evidence must be so strong and persuasive as to leave no room for reasonable doubt", citing numerous authorities. And the court further said: "In Morris v. Davies, 5 Cl. and F. 163, Lord Lyndhurst says of the presumption of the validity of a second marriage:

" 'Is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.'

"And in the case of Piers v. Piers, 2 House of Lords Cases, 331, it was said by Lord Campbell that the validity of the marriage could only be negatived 'by disproving every reasonable possibility.' "

Later in the same opinion the court used language particularly appropriate here: "If

624

it should be argued that to permit the presumption of a divorce, arising from the second marriage, should not be given effect without some corroborating circumstance, such support is abundantly supplied in the admitted fact that the acts and conduct of both parties to the first marriage had for 10 years or more been wholly inconsistent with the continuance of the marriage relation between them. They had not met in all that time so far as shown, nor had either made any assertion or claim of marital rights as against the other nor had either contributed anything whatever to the support, care, or comfort of the other. Though the wife during all this period continued her residence in Fulton county, which county was also Johnson's home until he deserted her and where his mother still lives, this man and woman had been and remained as utter strangers to each other. If the presumption of divorce between them depended on corroboration (which it does not) more persuasive circumstance could not be desired. Leach v. Hall, 95 Iowa [611], 616, 617, 64 N.W. 790."

It has been repeatedly held by the Iowa courts that the public welfare is involved in matters affecting the marriage status. The court expressed itself in a divorce proceeding, Walker v. Walker, 205 Iowa 395, thus at page 398, 217 N.W. 883, at page 885:

"The State is a party in interest in such a result (the effect of a divorce decree). The nominal plaintiff and defendant are not the only parties to the suit. The State and the public are parties, by implication. As said in Grant v. Grant, 84 N.J.Eq. 81 (92 A. 791), quoting from 2 Bishop on Marriage, Divorce and Separation, Section 663:

" 'The public, which we have seen to be a party in all divorce suits, occupies a unique position, sometimes embarrassing to the court.' "

Earlier in Mohler v. Shank's Estate, 93 Iowa 273, 61 N.W. 981, 34 L.R.A. 161, the Iowa court recognized a complete estoppel to question the validity of a void divorce. The defendant Shank was under guardianship as a person of unsound mind when his guardian brought suit for divorce against the wife because of her adulterous relations. A court granted a decree and awarded to her in accordance with the stipulation of the parties certain money and the remission of a judgment against her for misapplication of the ward's money while she was guardian. Upon the death of Shank the divorced wife who had remarried the one with whom she had lived in adultery, sought to have set of her dower or distributive share. The court denied the right. It found the decree of divorce to be void and then said, 93 Iowa at page 282, 61 N.W. at page 984: "This exception to the doctrine that a judgment or decree entered without jurisdiction is absolutely void is founded upon the plainest principles of justice. As applied to the case at bar, it is but the enforcement of the legal maxim that the law will not permit a person to take advantage of his own wrong. We can discover no reason why Mrs. Mohler should be allowed to masquerade in a court of justice as the widow of Anthony Shank, and at the same time claim that she was the wife of Mohler for about eight years before Shank died. Both the law and good morals forbid it. Having accepted the divorce as valid, in the way she did, she should be held to be estopped from maintaining any claim to any part of the estate of her former husband. The conclusion we have reached in this case on the question of estoppel is not directly supported by decisions of this court, but it appears to us that it is in harmony with modern legislation upon the relation of husband and wife. See chapter 2, tit. 15, of the Code. The rights of a wife in her property, and her capacity to contract with reference thereto, are plainly conferred upon her. Section 2213 is as follows: 'Contracts may be made by a wife, and liabilities incurred, and the same enforced by or against her to the same extent and in the same manner as if she were unmarried.' She cannot enter into a contract to divorce herself from her husband. But we discover no reason why the law of estoppel may not be applied to her acts in a case like this. The decree in the suit in equity, and the order sustaining the claim for a distributive share in the estate, are reversed."

In Swift v. Swift, 239 Iowa 62, 29 N.W. 2d 535, 539, the court concerned itself "not

alone with the rights of the individuals involved but also with the public interest." It said, 239 Iowa at page 69, 29 N.W.2d at page 539: "Courts are disposed to protect an innocent third person who has married a divorced spouse, also to protect possible issue of such marriage, and manifest reluctance to set aside the divorce." Plaintiff wife in that case and defendant husband were married in 1941 and had four children. He left home in June 1946. She filed a divorce action on July 5, 1946. The court granted the divorce. Defendant later appeared in the proceedings in 1947 and sought to vacate the decree, claiming that the attempted service by publication and by personal service was ineffective. The trial court ruled that the published notice was a nullity, that personal service was not made until after the divorce had been granted, that the decree was void and that the defendant was not barred from challenging it. In its opinion the court said: "In many situations it may be in the public interest to recognize an invalid divorce and preserve a remarriage rather than to resort to a dubious attempt to resurrect the original marriage." 239 Iowa at page 69, 29 N.W.2d at page 539.

The opinion contains a full discussion of the expressions of the Iowa court as to domestic relations and concludes: "We are persuaded not only that defendant is precluded by laches, estoppel and lack of good faith from seeking an annulment of the decree, but also that a reversal will best serve the ends of justice and the interests of society as well."

The legislature has sought to protect the public, the innocent parties and issue of a questionable marriage by the enactment of Section 595.19, Code of Iowa, 1950, I.C.A. It reads:

"Marriages between the following persons shall be void:

\*    \*    \*    \*    \*    \*

"4. Between persons either of whom has a husband or wife living, but, if the parties live and cohabit together after the death or divorce of the former husband or wife, such marriage shall be valid."

█ Counsel for the brothers and sisters argue that this statute has the effect completely to exclude Margaret Crawford from recovery here because, having validated her marriage to Louis Crawford by their cohabitation after insured's death, its effect is to validate it back to the ceremony in 1942. If that is correct, it would operate as a bar to her claim to benefits as widow of the insured. Certainly she did "live and cohabit" with Louis Crawford after insured's death in 1945 and her marriage in 1942 under Iowa law thereby became "valid." That statute is silent as to whether it was valid only after insured's death or was validated from its consummation in 1942. If the purpose of the legislature in enacting Section 595.19 was in the public interest to protect the issue of such marriage, it is understandable that the statutory validation should reach back to the date of the second marriage ceremony. Otherwise, children born since the date of the death of the former spouse would be legitimate while those born before that date of the same parents would be illegitimate. That would defeat the apparent legislative purpose. However, we do not decide that question. The statute appears to lend support to our conclusion, but the decision in this case primarily is based on the Iowa law as declared in the cases cited above and other cases and as applied to the record made before this court.

█ By the law of Iowa Margaret Crawford is deprived, and the Supreme Court of the State says, even estopped from claiming to be the widow of the insured. Her acts, admissions and conduct disqualify her. In effect, by the law of Iowa the public interest completely dominates and subordinates any right she now claims. The presumption which the law of Iowa creates as to the validity of her second marriage is a presumption of which she too is the beneficiary because it absolves her from bigamous conduct or intent.

The mention of intent suggests that such a determination as to the disposition of the benefits under the policy as must follow executes the apparent intent of the insured. Surely that apparent intent should not be wholly ignored. It must be remembered that he applied for the insurance, paid the premium and named his mother as bene-

ficiary. It is to be inferred, even assumed, that had he considered the wife of another man to be his wife he could and would have named her as beneficiary. He did not for obvious reasons. It may be inferred that believing her to be the wife of another, believing, as did his family, in the death of his father, he believed he needed to make no change of beneficiary on his mother's death because his brothers and sisters would ordinarily take. It may be unusual, but it is not unreasonable, to give some attention to the result of his conduct and to attribute to it a modicum of desire and purpose, although that has not been controlling here.

The court recognized that it has been said in this Circuit, Rittgers v. U. S., 154 F.2d 768, 772, that Margaret Crawford's claim to recover is dependent upon "her legal status, not upon her morals, her worthiness, nor her social standing." The court has confined its opinion here wholly to Margaret Crawford's legal status under the Iowa law and has entirely ignored any consideration of the other factors.

On the whole record this court must find that the claimant Margaret Crawford has wholly failed to overcome by evidence "which is strong, distinct, satisfactory and conclusive" the presumption which the Iowa law creates in favor of the validity of her second marriage and the dissolution of the first. She has failed to overcome the presumption of the validity of the second marriage and by "evidence so strong and persuasive as to leave no room for reasonable doubt," as required by Iowa law. In this situation the court must find that under the law of Iowa Margaret Crawford may claim no marriage rights as the widow of the insured.

■ This finding leaves the father as the only one entitled by Class C above, Sec. 802(h) (3), Title 38 U.S.C.A., to take the benefits. However, the father after due service is in default and so adjudged to be. The court also finds by reason of proof of his absence for more than 25 years that he may be and is presumed to be dead.

■ There being no one in the other preceding classes, the brothers and sisters, who are defendants here, are found to be entitled to take the benefits of the policy of insured as members of Class D.

*Counsel for the Government will prepare, serve and submit findings of fact and conclusions of law consistent with this memorandum opinion. Defendant Margaret Crawford excepts.*